[Civ. No. 29622.   Second Dist., Div. Two.   Jan. 28, 1966.]

SAM ROSEN et al., Petitioners, v. INDUSTRIAL ACCI-
DENT COMMISSION and JAMES LEFFEW, Re-
spondents.

Rose, Klein & Marias and Eugene Marias for Petitioners.

Everett A. Corten, Edward A. Sarkisian, Romaine E. Har-
per and Harry L. Mason for Respondents.

HERNDON, J.—Petitioners Sam Rosen and Esther Rosen
seek by writ of review to annul an award of respondent com-
mission in favor of James Leffew, hereinafter referred to as
applicant.

Applicant and his wife were tenants in a six-unit apartment
building allegedly owned by petitioners. Several months after
commencement of their tenancy, applicant and Mr. Rosen
entered into an agreement whereby applicant and his wife

were to perform certain services upon the premises in consideration of a $25 per month credit allowance on their apartment rental of $85 per month. Their duties included mowing and watering the lawn, taking out the trash on pickup days, receiving rental payments from certain tenants, and showing apartments to prospective tenants when vacancies existed. It was agreed that either applicant or his wife would be on the premises until 6 p.m. each day to receive complaints from tenants and until 10 p.m. whenever there was a vacancy in the building.

On February 23, 1963, at about 8 p.m., applicant fell and injured his arm while descending an outside stairway which led from the second floor where his apartment was located. At the time he was injured, no vacancy had existed for several months and applicant was on a personal mission to see his brother-in-law who had just driven into the area.

At the same time applicant was employed full time in his regular job. Applicant's income tax return, filed jointly with his wife, did not list as income the consideration received by them under their arrangement with petitioners, and in his initial medical histories given after his injury, he stated that it had not arisen out of his employment. He had never before performed services of the instant variety. Petitioners were not insured for workmen's compensation.

By the order under review, petitioners were ordered by the respondent commission to pay applicant temporary disability benefits beginning February 24, 1963, through September 7, 1963, at the rate of $31.49 per week in the total amount of $881.72, plus interest, together with reimbursement for self-procured medical treatment in the approximate amount of $500 and attorney's fees in the sum of $400.[1] An award was also made against petitioners for further medical treatment. The hearing on the issue relative to the extent of permanent disability was continued until a showing might be made that the disability had become permanent. It was held that petitioners were not wilfully uninsured and that their failure to pay compensation had not been unreasonably delayed nor refused.

---

[1] Of the $881.72 awarded to applicant herein as temporary disability payments, $818.74 thereof is to be repaid to the Department of Employment in satisfaction of its lien for unemployment disability benefits theretofore received by applicant. In addition, applicant testified that he was a member of the group insurance plan available to employees of his regular full time employer. This plan provided for payment of 80 percent of his medical expenses incurred herein.

The theory upon which the respondent commission based its order was that by reason of the fact that the duties of applicant and his wife contemplated that they live upon the premises in order to enjoy the benefits of their rental allowance, their apartment was thereby converted into the equivalent of the lodgings supplied to ordinary full time employees under the "bunkhouse" rule. We are unable to agree that either the theory or the philosophy underlying the development of the bunkhouse rule would warrant its application to the undisputed facts of the instant case.

Petitioners concede, of course, that they would have been liable if applicant or his wife had been injured while performing any of the services required of them by the terms of their agreement, such as mowing the lawn, removing the trash, attending to complaints, etc. They argue, however, that it is unreasonable and beyond the contemplation of the Workmen's Compensation Act to hold that an agreement between a landlord and his tenants whereby a modest rental allowance is given the tenants in return for certain relatively nominal services creates a situation in which the landlord must furnish, in effect, a completely comprehensive health, accident and life insurance policy covering the tenants 24 hours a day so long as they are upon the premises. We agree.

██ The bunkhouse rule is no more than an extension of the general rule that where an employee is injured while on his employer's premises as contemplated by his employment contract, he is entitled to compensation for injuries received during the reasonable and anticipatable use thereof. In each case cited to us, it was by reason of the employment relationship that the employee was expected or required to reside upon the employer's premises. The landlord-tenant relationship was entirely subsidiary and collateral to the basic employment relationship.[2] It was a condition either required

---

[2] Cases such as *Argonaut Ins. Co.* v. *Industrial Acc. Com.*, 221 Cal. App.2d 140 [34 Cal.Rptr. 206], cited by respondents (see also, *Leonard Van Stelle, Inc.* v. *Industrial Acc. Com.*, 59 Cal.2d 836 [31 Cal.Rptr. 467, 382 P.2d 587]; *Wiseman* v. *Industrial Acc. Com.*, 46 Cal.2d 570 [297 P.2d 649]; *Phoenix Indem. Co.* v. *Industrial Acc. Com.*, 31 Cal.2d 856 [193 P.2d 745]; *Lockheed Aircraft Corp.* v. *Industrial Acc. Com.*, 28 Cal.2d 756 [172 P.2d 1]) are not in point. They stand for the general proposition that "The status of an employee *acting in the course of his employment* is not destroyed by the fact that he may be *pursuing a dual purpose*. If he is carrying out some duty or right in connection with his employment, and combines with it an object of his own, he is still considered to be acting in the course of his employment." (Italics added.) (*Argonaut Ins. Co.* v. *Industrial Acc. Com., supra*, p. 144.) We are not here concerned with an act performed in the course of employment for a dual purpose. Rather, we are faced with a situation that

by the employer in order that he might more adequately avail himself of the employee's services at any time, or as an extra compensation supplied to the employee in addition to the primary consideration of wages or salary paid. No case has been cited in which the bunkhouse rule was applied in an instance where the basic relationship was that of landlord and tenant with the tenant being employed full time in other pursuits and merely rendering relatively minor services to his landlord.

Perhaps the most expeditious and satisfactory way to demonstrate the underlying philosophy of the bunkhouse rule would be to examine the factual situations presented in certain of the leading California cases in which the rule has been developed and applied.

In *Larson* v. *Industrial Acc. Com.*, 193 Cal. 406 [224 P. 774], certain farm laborers were injured when a stove located in their bunkhouse exploded. The court stated at pages 409-410: "It is, of course, a fundamental doctrine that it was not intended by the compensation act that an employer who comes within its provisions shall be the insurer of his employee at all times during the period of employment, but is liable for compensation only when the injury occurs to the employee while performing some act for the employer in the course of his employment, or is doing something that is incidental thereto. There must be some connection between the injury and the employment other than the mere fact that the employment brought the injured party to the place of injury. There must be a causal connection between the employment and the injury which had its origin in a risk connected with the employment, and flowed from that source as a rational and natural consequence. [Citation.] But whether a given accident is so related or incident to the business in which the employee is engaged *must depend upon its own particular circumstances. No exact formula can be laid down which will automatically solve every case.* [Citations.]

"Petitioners' first premise is that the injured men were not required to be in the bunkhouse at the time of the explosion and their consequent injury. The proposition falls before the evidence in the case. The Larson ranch was situated ten miles from Stratford, and there was no nearer place where

---

places the parties in a dual relationship, i.e., landlord-tenant and employer-employee, and absent the possible application of the bunkhouse rule, it is clear that the applicant's injuries did not arise in the course of his employment and the act creating them admittedly was being pursued solely for applicant's personal benefit.

they could obtain lodging. The bunkhouse was the only place provided for that purpose, and was the only place where the men could pass the time while momentarily unemployed. The consideration for their services was not alone *the wages paid by Larson,* but board and lodging furnished at the bunkhouse were reckoned *as a part* of their pay. Larson testified that the men could not live in town and work for him." (Italics added.)

In *State Comp. Ins. Fund* v. *Industrial Acc. Com.,* 194 Cal. 28 [227 P. 168], a full time maid in a hotel was injured by reason of conditions existing at the particular entrance to the hotel which she, as an employee, was required to use. She was injured while leaving the hotel on her day off. The court held that while she had not been required to live in the hotel, as was true in *Larson, supra,* nevertheless this arrangement was a part of her contract of employment and "in sleeping in the room at the hotel, [she] was but collecting *a portion* of her wages." (Italics added.) (P. 34.)

In *Union Oil Co.* v. *Industrial Acc. Com.,* 211 Cal. 398 [295 P. 513], a captain of a barge was killed as he attempted to board the barge for the purpose of sleeping thereon during the night in order to be able to move it early the following morning. The court held that, although he was not compelled to sleep aboard the barge by any direct orders of his employer, he had been given the discretionary privilege so to do and had exercised it in order to properly perform his duties. The accident, therefore, was held to have occurred during the course of his employment and to have arisen therefrom.

In *Truck Ins. Exchange* v. *Industrial Acc. Com.,* 27 Cal.2d 813 [167 P.2d 705], a farm hand who had been working on one ranch owned by his employer was killed while driving to the neighboring ranch owned by his employer on which a house he occupied as part of his compensation was located. It was held that compensation was due. The court stated at page 818: "So here Dollarhide [the employee] could have agreed to work *for wages of $165 a month* only. But Peterson [the employer] testified, 'the only way you can get anyone is to furnish a house.' And the offer of employment which Peterson preferred that Dollarhide accept [because he thought it was safer to have the house occupied], and which Dollarhide did accept, was for compensation of '*$165 a month, and a house.*' Though Dollarhide could have moved from the ranch at will he had not done so; his agreement to occupy the ranch remained a term of the employment contract, and regardless of whether he was performing a service to his employer by

residing in the house he was entitled to collect his compensation for services rendered on the other ranch and such compensation *included* the occupancy of the house on the 'Traver Ranch.' [Citation.]'' (Italics added.)

In *Madin* v. *Industrial Acc. Com.*, 46 Cal.2d 90 [292 P.2d 892], full time caretakers and managers of 14 rental units were injured at night when a bulldozer crashed into their apartment. ''Madin employed the Richardsons to act as caretakers and managers of the property and collect the rent. They were on duty 24 hours a day and were available to meet any problems that arose during those hours. For this *they received 10 per cent of the rentals* and a discount on the rent of the unit occupied by them; *Richardson was also to receive $1.50 per hour for any day labor performed by him.*'' (Italics added.) (P. 92.)

In addition, of course, the issue presented in the instant case was not discussed in *Madin* because, as pointed out by the court at page 92: ''Petitioners [the employer and his insurance carrier] *concede that the injuries occurred in the course of employment* but say they did not arise out of the employment . . . .'' (Italics added.) The court, therefore, was not required to analyze the bunkhouse rule as such. Liability was established merely by stating the general rule, pages 94-95: ''Where the injury occurs on the employer's premises, *while the employee is in the course of the employment* [the conceded fact in *Madin*], the injury arises out of the employment unless the connection is so remote from the employment that it is not an incident of it.'' (Italics added.)

In *Employers' etc. Corp.* v. *Industrial Acc. Com.*, 37 Cal. App.2d 567 [99 P.2d 1089], a cook-maid who lived on her employer's premises and was on call 24 hours a day was injured while standing on a stool in her room attempting to fix a dress. It was held that the right to compensation existed.

In *Fidelity & Cas. Co.* v. *Industrial Acc. Com.*, 176 Cal. App.2d 541 [1 Cal.Rptr. 567], an employee who had been hired for a 28-month tour of duty in Indonesia, and who was on call there 24 hours a day, was injured while on a pier and engaged in recreational swimming. ''*He was paid a monthly salary of $700,* plus board, lodging and medical services.'' (Italics added.) (P. 542.) It was held that coverage existed.

In *Aubin* v. *Kaiser Steel Corp.*, 185 Cal.App.2d 658 [8 Cal. Rptr. 497], a full time employee at the desert mine operated by his employer was injured when he was struck by his

employer's train while still on his employer's property as he was driving into the nearest town on personal business during his off duty hours. Although not required to do so, the employee lived upon his employer's property in facilities provided for its employees. The court stated at page 662: "Here, there were no adequate housing facilities within a reasonable distance. Aubin's [the employee] family went to Banning to locate a home after terminating their stay at the mine. We conclude that the 'bunkhouse rule' is applicable even though Aubin was required to make payment for the board and room supplied to him by defendant at a reduced rate *lacking in profit*. [Citations.]" (Italics added.)

As heretofore indicated, our purpose in setting forth the foregoing typical cases is not to demonstrate that the instant case necessarily fails to meet the specific tests suggested for applying the bunkhouse rule in those employment situations to which it is applicable. Rather, we hope thereby to make clear that prior to reaching these specific tests, a type of employment relationship not present in the instant case must exist in order to call for any consideration of the applicability of the rule.

Thus, in each of the cited cases the employee's occupancy of, or presence upon, the employer's premises was merely a subsidiary portion of the basic full time employment relationship that existed. Once such relationship is established as a condition precedent to the possible applicability of the rule, it then becomes of importance to consider whether the occupancy of the employer's premises is either (1) required by the employer, or (2) offered by the employer as *additional* compensation forming part of the employment contract.

Viewed from a strict semantic point of view, the facts in the instant case satisfy these two tests. The applicant testified that he and his wife were required to continue their tenancy if they were to avail themselves of the rental allowance. The rental allowance was not only part of the compensation received by them, it was the sole compensation. Further, it was part of their duty as "part time managers" to receive complaints from their fellow tenants and applicant testified that some 10 to 20 complaints were received during their months of service and that some of these were made outside the hours during which it was specified that either he or his wife should be present.

Nonetheless, we cannot hold that it was the intent of our Legislature in adopting the beneficent provisions of our

Workmen's Compensation Act, or the intent of our courts in developing and promulgating the bunkhouse rule as an expression of an implicit intent and purpose of the act, to provide that landlords should be required to provide compensation for their tenants in circumstances such as those here presented. It is to be remembered, of course, that applicant's wife was as much an employee as the applicant himself. In fact, since applicant worked full time in his regular employment, it would be the wife who would be present to receive complaints throughout almost the entire day until 6 p.m., during which time either applicant or his wife was required to be present on the premises.[3] If she had fallen in her bathtub while bathing at night or had injured her back while making her children's beds or had cut her finger while preparing dinner or while operating a sewing machine, she too would have been as fully entitled to compensation under the bunkhouse rule as would her husband when he fell down the stairs while descending to see his brother-in-law on a personal errand.

Rules of law should be accorded no talismanic power to thrust themselves into, and to control, situations to which they are not reasonably and realistically applicable. Rules of law are developed as *the products* of the process of deciding what rights and duties have existed in *specific factual circumstances* and are designed to serve as aids in the proper resolution of conflicts arising therein. The boundaries of their reasonable application are determined by the comparability of the factual picture presented in each succeeding case. To allow the literal terminology of a rule to determine all the factual situations to which it must be applied very often would serve to defeat, rather than to promote, just and rea-

---

[3]In this regard, the following testimony was given: "Q. Mr. Leffew, calling your attention to the day that you had this conversation with Mr. Rosen about doing certain work for $25 per month, this, I believe you indicated was approximately four to six months before your accident; is that right? A. Yes, sir. . . . Q. At that time were you working for Hibbs [applicant's full time employer]? A. Yes, sir. Q. And I assume at the time you worked during the day time, did you not, for Hibbs? A. Yes, sir. Q. And during this conversation with Mr. Rosen, did you let him know or did he indicate that he knew that you were working for Hibbs? A. He knew I was working, yes, sir. Q. And did he indicate who was to do the work for this $25 per month when something came up and you weren't there? A. Yes, sir. Q. And who did he indicate that would be? A. My wife. Q. I see. And after that date for this $25 a month, would it be correct that both you and your wife then rendered certain services? A. Yes, sir. Q. In other words, when something came up and you weren't there she was there if it was within this line she would take care of it; is that right? A. Yes, sir."

sonable judicial dispositions of conflicting claims arising from an infinite variety of facts and in a world of constantly changing conditions.

We believe the basic aim of the Workmen's Compensation Act will be more justly and properly served by limiting the liability of the landlord-employer of the type involved in the instant case to those situations in which the tenant-employee sustains injury while he is engaged more directly in performing some service required of him and by refusing to extend the landlord's liability to cover an injury sustained by the tenant while engaged in an activity having no semblance of connection with any employment relationship but involving an activity incident only to the continued enjoyment of his rights as a tenant.

The award is annulled.

Roth, P. J., and Fleming, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied March 22, 1966.